IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHLLE RICHARD, individually, as Wife
And Heir-at-Law, and as
SPECIAL ADMINISTRATOR
OF THE ESTATE OF STACY RICHARD,

                      Plaintiff,

Vs.                                  Case No. 15-CV-1279

CITY OF WICHITA, KANSAS;
CITY OF WICHITA POLICE
DEPARTMENT OFFICERS
BRUCE MACKEY #1771,
MATTHEW PHILLIPS # 2281,
WILLIAM STEVENS #1821
BRIAN ARTERBURN #1524
And MICHAEL K. O'BRIEN, #1785.

                    Defendants.
_____

## AMENDED COMPLAINT

COMES NOW the Plaintiff, by and through her counsel of record, James A. Thompson of the law firm Malone, Dwire & Thompson, LLC, and Donald Snook of Snook Law Offices and for her Complaint against Defendants, Plaintiff alleges and states as follows:

## NATURE OF ACTION

This case arises out of the unreasonable use of deadly force by Defendants Bruce Mackey, Brian Arterburn, William Stevens, Matthew Phillips and Sgt. Michael O'Brien (hereinafter collectively known as "Defendant Officers") when they shot the decedent Stacy Richard 16 times on February 25, 2014. Mr. Richard's therapist informed 911 that Stacy was suicidal and in his house alone with a gun. The Defendant Officer's violated Stacy Richard's Fourth Amendment rights, as well as Wichita Police Department policy and commonly accepted police practices and

procedure, by wrongfully attempting to enter and clear the residence within five minutes of arriving on scene even though they knew Stacy was alone and not an imminent danger to the officers or others. Rather than securing the perimeter and de-escalating the situation as policy and training dictate, these Defendants unnecessarily escalated the situation and put themselves in a position in which they believed they needed to shoot Stacy Richard.  The Defendants' actions directly caused their perceived need for lethal force. Stacy Richard suffered 16 gunshot wounds to his body and initially he physically survived the shooting. However, the emotional and physical toll of the shooting, including impotence and resulting loss of consortium with his wife, in combination with the lingering threat by the Defendant City to have Stacy charged with felony assault of a law enforcement officer resulted in Stacy Richard taking his life 8 months after he was shot. Mrs. Richard brings federal claims for civil rights violations and state law claims against the Defendants including wrongful death and negligence. The lawsuit is brought on behalf of Michlle Richard, individually, as wife and sole heir-at-law, and as the Special Administrator of the Stacy Richard Estate.

## JURISDICTION AND VENUE

1.      This action arises under the 4th and 14th Amendments to the United States Constitutions, 42 U.S.C. §1983 and §1988, and Kansas law.

2.      This court possesses jurisdiction to hear these claims.

3.      The amount in controversy exceeds $75,000, exclusive of costs and interest.

4.      Venue is proper, in that all of the claims herein occurred within Sedgwick County, Kansas, and all of the parties herein are from Sedgwick County, Kansas.

5.      Plaintiff served Defendant City of Wichita, Kansas with proper and sufficient notice pursuant to K.S.A. 12-105b, detailing the facts of Plaintiff's state law claims and

complying with all aspects of Kansas substantive and procedural law relating to claims against municipalities and their employees pursuant to the Kansas Tort Claims Act.

6.      The City of Wichita denied the state law claims on July 27, 2015.

## PARTIES

7.      Plaintiff Michlle Richard is a resident of Sedgwick County, Kansas, a United States citizen, the surviving spouse of Stacy Richard, and the Special Administrator of the Estate of Stacy Richard, deceased, which was filed in the 18th Judicial District of Sedgwick County, Kansas, Case No. 15PR197.

8.      Defendant City of Wichita, Kansas, (hereinafter "City") is a city and municipality organized under the laws of the State of Kansas. The City may be served with process at 455 N. Main, Wichita, Kansas 67202. The Wichita Police Department is a department within the Defendant City of Wichita.

9.      Defendant Bruce Mackey, #1771, is an officer of the City of Wichita Police Department. As such, he was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and so acted under the color of law and in the scope of his employment at all times relevant to this action. He may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, KS 67211.

10.     Defendant Brian Arterburn, #1524, is an officer of the City of Wichita Police Department. As such, he was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and so acted under the color of law and in the scope of his employment at all times relevant to this action. He may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, KS 67211.

11.     Defendant Michael O'Brien, #1785, is an officer of the City of Wichita Police Department.

As such, he was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and so acted under the color of law and in the scope of his employment at all times relevant to this action. He may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, KS 67211.

12.     Defendant William Stevens, #1821, is an officer of the City of Wichita Police Department. As such, he was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and so acted under the color of law and in the scope of his employment at all times relevant to this action. He may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, KS 67211.

13.     Defendant Matthew Phillips, #2281, is an officer of the City of Wichita Police Department. As such, he was a duly appointed agent authorized to enforce the laws of the City of Wichita, and the State of Kansas and so acted under the color of law and in the scope of his employment at all times relevant to this action. He may be served with process at Wichita Police Department, Patrol South Bureau, 211 E. Pawnee, Wichita, KS 67211.

## FACTS RELEVANT TO ALL CLAIMS

### Stacy Richard Personal and Family History

14.     Stacy Richard and Michlle Richard were married in 2004.

15.     Michlle Richard has two daughters that Stacy Richard helped provide for and raise.

16.     Until his death, Stacy remained very involved in his step-children's lives teaching them to shoot, hunt, and fish.

17.     Stacy provided both emotional and financial support for his family.

18.     Stacy was an avid hunter and shooter and qualified to obtain a conceal carry license in Kansas.

19.    Stacy was a hardworking middle class, blue collar man, who enjoyed spending time with his family and friends.

20.    Stacy remained steadily employed throughout his life up to the time he was shot by the Defendants in this case. He worked at Spirit Aero systems and worked at Boeing prior to that on the assembly line.

21.    Stacy was diagnosed with and suffered from severe clinical depression.

22.    Stacy Richard was in severe mental crisis and needed help when he was shot 16 times in his home by Defendants Mackey, Arterburn, Stevens, and Phillips on February 25, 2015.

### Wichita Police Department Mental Health Policy

23.    The actions of all WPD Officers, including Defendants herein, are governed by Wichita Police Department Policies, Regulations, and each Bureau's Standard Operating Procedures.

24.    Wichita Police Department Policy 5.19 addresses how Wichita Police Department Officers are to handle individuals with mental illness.

25.    "Mental Illness" is defined by WPD Policy 5.19 as "A condition characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning which can be caused through a variety of means, including but not limited to: social, psychological, biochemical, genetic, illness or injury."

26.    The Wichita Police Department has specially trained officers called Crisis Intervention Team Officers (CIT Officers) who are specifically trained to deal with mentally ill citizens and de-escalate situations by using de-escalating techniques.

27.    CIT Officers receive special training from Sedgwick County, Kansas.

28. According to Sedgwick County's information on CIT training, "[L]aw enforcement officers are trained to de-escalate potentially dangerous situations involving individuals with mental illness, intellectual disabilities and/or developmental disabilities (ID/DD)[1]. *Because police officers are often the first responders in these incidents, it is essential that they know how critical periods of mental illness alter behaviors and perceptions, can assess what is needed in the moment, and can bring understanding and compassion to bear when they are handling these difficult situations.*[2]" (Emphasis added.)

29. The WPD Policy Manual, Policy 519.02 "Mentally Ill Persons/Crisis Intervention Team" states that CIT Officers are the "preferred response to all calls involving mental health crises."

30. SIGNAL 4 is the dispatch code given for suicide calls by WPD and which was assigned to Stacy Richard's case on February 25, 2015.

31. According to former WPD Deputy Chief Tom Stolz, Wichita has seen a marked increase in the number of police cases involving mentally ill people, with Wichita officers handling more than 1,900 cases involving the mentally ill in 2008.

32. According to Deputy Chief Stolz, by 2011, the number of cases involving the mentally ill had risen to more than 2,600, and 2012 was expected to be higher.

33. In 2012, according to former WPD Deputy Chief Tom Stolz, WPD Officers were trained to talk to the mentally ill and be as helpful and understanding as possible.

34. Despite the recognition by WPD that cases involving the mentally ill were steadily rising every year, and that officer would likely encounter situations with citizens suffering a

---

1 http://www.sedgwickcounty.org/cddo/facts_and_details/Community%20Resources.pdf
2 http://www.sedgwickcounty.org/criminal_justice/documents/2013%20CJCC%20Briefing%20Book.pdf

mental health crisis, WPD leadership failed to properly train and supervise its officers to deal with the mentally ill.

***Wichita Police Department Use of Force Policy***

35.    WPD Regulation 4.1 governs "Weapons/Use of Force".

36.    WPD Regulation 4.101 ("Reg. 4.101") issued and revised as of February 16, 2012 states the following in pertinent part:

> In a stressful situation, **a police member's first reaction should be to determine whether the objective can be accomplished without the use of a weapon**. A member's decision, relative to the use of force, must be legally justifiable, and thoroughly articulated, **considering both the nature of the crime and circumstances surrounding it**.
>
> This Department recognizes and respects the value and special integrity of each human life. In vesting police members with the lawful authority to use force to protect the public welfare, **a careful balancing of all human interests is required**. Therefore, **it is the policy of this Department that police members shall use only that force that is objectively reasonable** based on the totality of the circumstances, to effectively bring an incident under control, in making a lawful arrest, while protecting the life of the member, or the life of another person. (Emphasis added.)

37.    WPD Regulation 4.105 "Situations When Discharging a Firearm Is Not Justified" states that "an officer is not justified in discharging a firearm **when use of less force would safely accomplish the objective**."(Emphasis added.)

38.    WPD Regulation 4.106 "Use of Less-Lethal Force" states "Where lethal force is not authorized, members should assess the incident in order to determine which less-lethal force technique or weapon will best de-escalate and bring the incident under control in a safe manner."

39.    When a person is suicidal, and there is no threat of harm to anyone other than themselves, the best de-escalation technique is to slow things down and not rush into the house.

40.    Wichita now uses a "Threat Assessment" policy regarding the use of force.

41.     Threat Assessment teaches the officers to imagine the worst scenario possible and act on that assumption rather than the objective facts before them.

***Policy for Suicidal Person***

42.     WPD Policy 602 governs the policies for barricaded individuals including a suicidal person inside his home.

43.     First responding officers are supposed to cordon off the area and call SWAT and a negotiator.

44.     The goal of the first responder is to de-escalate the situation by creating time and space for the incoming SWAT team and negotiator.

45.     First responding officers should not attempt to breach the home when a suicidal person is home alone, unless there is imminent danger to the officers or others.

46.     Time is the most important asset when dealing with people in crisis and allows for better intelligence, a better response and the passage of time calms people down.

47.     The first few minutes of a crisis event are the most critical and set the stage for future actions in a mental health crisis incident.

*48.*    The passage of time tends to calm a person down and make it easier to convince them that they are doing something wrong and should stop.

*49.*    If within an officer's control, it is best to allow time to pass and let a person calm down before making the initial contact.

50.     Many times a suicide call is a cry for help by the person threatening to commit suicide.

51.     When responding to a suicide call, safety is of the utmost concern.

52.     Unnecessarily placing officers or the suicidal person at risk of harm should be avoided.

*Pattern and Practice of Concealing Misconduct*

53.     Information on the officer involved shootings is difficult to obtain, particularly in regards to the identity of officers involved because of Defendant City's policy of refusing to release information. Despite the City's position in *Fettke v. City of Wichita,* that Wichita Police Officers as public officials do not have a right to privacy, the City refuses to release the names of the officers involved citing privacy rights of the officer.[3]

54.     The City's policy of not releasing information on the officers involved in a shooting creates a veil of secrecy surrounding the shooting that casts doubt on the investigation into the shooting because there is no means of verifying or refuting the findings that a use of force was reasonable.

55.     Prior to questioning, WPD officers involved in shootings are allowed to meet privately with Critical Stress Incident Team members in a room without any recording devices. These Critical Stress Incident Team members are familiar with the process, procedures and standards for police shootings and are given unfettered access to the officer prior to questioning and have the opportunity to coach the officer on what to say and what not to say.

56.     Defendant City of Wichita does not have a civilian review board or police oversight committee regarding officer involved shootings or claims of excessive force, leaving the City's police department free from independent oversight.

57.     Officer involved shootings by Defendant City remain cloaked in secrecy with the shooting files made part of the WPD secret confidential records file recently disclosed in the media.

---

3 *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409, 412 (1998), wherein City of Wichita argued the city owed no duty of silence to Fettke, who was a police officer and a public official with no right of privacy and therefore the City should not be liable for the release of his name to the media.

58.     Current and past leadership at the City implemented a pattern and practice of concealing and covering up misconduct by its officers and leadership.

59.     This pattern and practice of concealing misconduct is evident in numerous incidents of misconduct by leadership itself that was never disclosed and which was actively concealed from the public including but not limited to:

   a.    Incidents of domestic violence committed by senior leadership that went unreported or that were swept under the rug;

   b.    Destruction of internal affair records of senior members of the police department by order of senior leadership;

   c.    Implementation of "training systems" designed to prevent the discovery of information about officers' use of force by classifying certain documents as "training aides."

   d.    Refusal to provide information on the identities of officers to the victims and families of victims of deadly force used by officers in an effort to stall or delay the filing of lawsuits against Wichita Police Department and its officers.

   e.    The lack of any meaningful internal review regarding the use of lethal force by officers.

   f.    The lack of any meaningful civilian oversight regarding claims of excessive force.

   g.    The lack of any meaningful criminal investigation into officer involved shootings.


***Numerous WPD Shootings***

60.     WPD were involved in at least 24 separate shootings incidents since 2010.

61.     WPD officers shot at least 29 people since 2010.

62.     WPD officers killed 13 people out of the 29 people they shot.

63.     WPD officers shot and wounded Cody Huggins on February 16, 2010. Mr. Huggins is
        African American. Defendant City of Wichita refused to publicly release the names of the
        officers.

64.     WPD officers shot and wounded Kenneth Junious on September 12, 2010. Mr. Junious is
        African American. Defendant City of Wichita refused to publicly release the names of the
        officers.

65.     WPD officers shot and killed Jerome Dixon on November 5, 2010. Mr. Dixon was African
        American. Defendant City of Wichita refused to publicly release the names of the officers
        and did not do so until ordered by a federal judge.

66.     WPD Officers shot and killed 41-year-old Robert Scharoun on November 12, 2010, in the
        driveway of his home. Mr. Scharoun was Caucasian. Defendant City of Wichita refused to
        publicly release the names of the officers.

67.     WPD officers shot and wounded Shelan Peters on December 1, 2010. Mr. Peters is African
        American. Defendant City of Wichita refused to publicly release the names of the officers.

68.     WPD Officers shot and killed 28-year-old Dejuan Colbert on October 31, 2011, striking
        him with 35 shots. Mr. Colbert was African American. Defendant City of Wichita refused
        to publicly release the names of the officers.

69.     WPD officers shot and wounded Shirley Smith on January 1, 2012. Mrs. Smith is African
        American. Defendant City of Wichita refused to publicly release the names of the officers.

70.     WPD shot and wounded 33-year-old Clifford Gustus on February 3, 2012. Mr. Gustus is
        Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

71.     WPD Officers shot and killed 22-year-old Marquez Smart on March 10, 2012, shooting

him 5 times in the back. WPD said he shot twice into a crowd even though Mr. Smart did not have any gun powder residue on his hands. The gun powder stippling and "bullet wipe" on his clothes where he was shot in the back indicates Mr. Smart was shot at close range. At least one witness states that Mr. Smart had submitted to authority, was unarmed and was lying on the ground when he was shot by WPD officers. Mr. Smart was African American. Defendant City of Wichita refused to publicly release the names of the officers.

72.   WPD officers shot and wounded a 19-year-old African American woman on March 10, 2012, while trying to shoot Marquez Smart. Defendant City of Wichita refused to publicly release the names of the officers.

73.   WPD officers shot and wounded an 18-year-old African American woman on March 10, 2012, while trying to shoot Marquez Smart. Defendant City of Wichita refused to publicly release the names of the officers.

74.   WPD officers shot and wounded a 17-year-old African American woman on March 10, 2012, while trying to shoot Marquez Smart. Defendant City of Wichita refused to publicly release the names of the officers.

75.   WPD officers shot and wounded a 29-year-old African American man on March 10, 2012, while trying to shoot Marquez Smart. Defendant City of Wichita refused to publicly release the names of the officers.

76.   WPD Officers shot and killed 24-year-old Troy Lanning II on April 1, 2012. Mr. Lanning is believed to have been Caucasian. Mr. Lanning was shot after he allegedly reached into a bag for a weapon.  No weapons were found on or near Mr. Lanning. The officer that shot and killed Mr. Lanning, Randy Williamson, also claimed he was the victim of shooting incident in 2008. Mr. Williamson also was involved in another shootings six months after

killing Troy Lanning. WPD terminated Mr. Williamson for his involvement in the third shooting in September 2012, wherein he was criminally charged for shooting a building and falsifying police reports claiming someone had pointed a gun at him from the shadows. The shooting of Troy Lanning is the only known shooting by a WPD officer where the District Attorney refused to clear the officer and refused to find the shooting justified.

77.   WPD Officers shot and killed 17-year-old Timothy Collins on April 13, 2012. Mr. Collins was African American. Officers allege he was involved in a burglary and robbery and came running out of a house with two others who were alleged to have been armed. The police do not appear to have given warnings prior to shooting Mr. Collins. Mr. Collins was not armed when he was shot. Defendant City of Wichita refused to publicly release the names of the officers.

78.   WPD Officers shot and wounded 21-year-old Ronald Vaughn on April 13, 2012. Mr. Vaughn is African American. Defendant City of Wichita refused to publicly release the names of the officers.

79.   WPD Officers shot and wounded 40-year-old Michael Westendorf on June 11, 2012 after he suffered a mental health crisis. Mr. Westendorf is Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

80.   WPD Officers shot and wounded 21-year-old Robert McNosh on June 11, 2012 after he suffered a mental health crisis. Mr. McNosh is Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

81.   After WPD Officers shot and wounded Mr. McNosh, former WPD Deputy Chief Tom Stolz stated he observed two "disturbing trends" with one being the increased number of incidents involving the mentally ill, and the second being the increase in officer involved

shootings in Wichita.

82.     WPD Officers shot and killed 45 year old Karen Jackson, on July 10, 2012, after she suffered a mental health crisis. Ms. Jackson was Caucasian and American Indian. She was also physical and mentally disabled. Defendant City of Wichita refused to publicly release the names of the officers.

83.     WPD officers shot and wounded 31-year-old Aaron Belcher on January 13, 2013. Mr. Belcher is Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

84.     WPD officers shot and wounded 31-year-old Michael Martinez. Mr. Martinez is Hispanic. Defendant City of Wichita refused to publicly release the names of the officers.

85.     WPD officers shot and killed 24-year-old Jason Woosypiti on July 11, 2013. Mr. Woosypiti was Caucasian and American Indian. Defendant City of Wichita refused to publicly release the names of the officers.

86.     WPD officers shot and wounded 45-year-old Stacy Richard on February 25, 2014 after he suffered a mental health crisis and threatened to commit suicide. His subsequent suicide in October 2014 is directly linked to the wounds received when he was shot 16 times by Wichita Police Department officers. Mr. Richard was Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

87.     A WPD officer shot and killed 30-year-old David Zehring on April 10, 2014. Mr. Zehring suffered from mental illness. Mr. Zehring was Caucasian. Defendant City of Wichita refused to publicly release the names of the officer.

88.     WPD officers shot and killed 26-year-old Marine veteran Icarus Randolph on July 4, 2014 in front of his family. Mr. Randolph was suffering a mental health crisis as a result of his

PTSD and fireworks. The Wichita Police Department officers responding to the mental health crisis refused to get Mr. Randolph help or call a supervisor. Mr. Randolph was African-American. Defendant City of Wichita refused to release the names of the officers.

89.    WPD officers shot and killed 18-year-old Jeffrey Holden on October 26, 2014. Mr. Holden suffered from mental health and substance abuse problems. Mr. Holden was Caucasian. Defendant City of Wichita refused to release the names of the officers.

90.    WPD officers shot and killed 23-year-old John Paul Quinterro on January 3, 2015. Mr. Quinterro was unarmed with his hands in the air when he was shot in the back with an assault rifle by the officer. Defendant City of Wichita refused to publicly release the names of the officers.

91.    WPD officers shot and wounded an unknown 45-year-old male on May 4, 2015. The race of the male is unknown. Defendant City of Wichita refused to publicly release the names of the officers.

92.    A WPD officer shot and killed 26-year-old Nicholas Garner on August 22, 2015. Mr. Garner suffered from Bi-Polar disorder and substance abuse. Mr. Garner was Caucasian. Defendant City of Wichita refused to publicly release the names of the officers.

93.    Of the 29 people shot by WPD officers, 14 are believed to be African American, 2 are believed to be Hispanic, and 13 are believed to be White.

94.     Of the 24 shooting incidents, 10 involved a person in mental health/behavioral crisis.

95.    Of the 10 incidents involving a mental health/behavioral crisis, 8 of the incidents resulted in the death of the individual.

96.    Defendant City of Wichita has exonerated the officers in all 29 officer involved shootings since 2010 and taken the position that they were all reasonable and justifiable.

*Investigations of Officer Involved Shootings*

97.   WPD considers officer involved shootings to be criminal investigations.

98.   Criminal investigations should analyze facts to reach a conclusion as to what occurred.

99.   Despite being a criminal investigation, Defendant City of Wichita immediately designates all officer involved shootings involving death as a "Justifiable Homicide" despite no such finding having been made by the Sedgwick County District Attorney.

100.   Once the shooting death is arbitrarily classified as a "Justifiable Homicide," Defendant City of Wichita's investigation is conducted in such a manner as to provide facts to support its predetermined conclusion that the shooting was justified.

101.   Facts and leads that would suggest the shooting was not justified are ignored and disregarded.

102.   The Kansas Bureau of Investigation is tasked with "overseeing" the investigation of WPD officer involved shootings.

103.   The KBI's involvement in investigations is limited at best and non-existent at worst, leaving Defendant City of Wichita and its police department to conduct the investigation of its own officers.

104.   When WPD officers are involved in shootings, they are supposed to be segregated from the other officers and taken to the 6th floor of the City building to await questioning regarding the shooting.

105.   Civilians involved in shootings are locked in an interrogation room that has audio and video recording equipment to record what occurs in the room and what is said. Civilians are not afforded access to anyone other than legal counsel prior to questioning.

106.    Rather than being forced to sit in a recorded interrogation room, WPD officers involved in shootings are allowed to sit in accessible offices that are open to anyone passing by who want to stop and speak with the officer.

107.    Despite being a suspect in a homicide, WPD officers are allowed to make phone calls prior to questioning.

108.    Prior to questioning and pursuant to the contractual arrangements between the City and the police officers' union, WPD officers are allowed to meet privately with their union representative in a room without any recording devices. These union representatives are familiar with the process, procedures, and standards for police shootings and are given unfettered access to the officer prior to questioning and have the opportunity to coach the officer on what to say and what not to say.

109.    Critical Stress Incident Team members are normally officers who have been involved in shooting themselves and who are familiar with the process, procedure, and standards used in investigating officer involved shootings.

110.    The interviews of officers involved in a shooting are conducted by Wichita Police Department Homicide Detectives, with a KBI agent sitting in on the interview, but rarely participating in the interview.

111.    Investigators ask inappropriate leading questions of the officers thereby suggesting the legally correct answer to find a shooting is justified such as "At that point, you thought he was going to shoot you, correct?" or "At that point, you were in fear for your life correct?"

112.    Investigators often ignore evidence contrary to the shooting officer's version of the events, such as the presence of stippling on victim's body even though the officer said he was too far away for stippling to be present.

113.   Investigators fail to conduct bullet angle analysis or other testing to confirm or contest the physical position of the officer and victim at the time of the shooting.

114.   Investigators fail to probe important details when questioning witnesses and the shooter.

115.   Investigators fail to determine whether less-lethal options were available, or whether the officer attempted de-escalation techniques.

116.   Defendant City of Wichita has never found that an officer involved shooting that resulted in serious harm or death, was excessive or violated policy.

117.   Defendant City of Wichita refuses to make administrative findings on the reasonableness of an officer involved shooting if litigation is pending.


*Comparison of WPD to National and Other City Statistics*

118.   The enormous number of police shootings by the Wichita Police Department is extremely abnormal for a city the size of Wichita and shows an unwritten *de facto* policy of unnecessarily using deadly force.

119.   According to the FBI, between 2009 and 2013 there was an average of 420 shootings per year by police officers resulting in death in the entire United States. [4]

120.   According to the FBI, there were 626,942 police officers in the United States in 2013.[5]

121.   Based on the FBI numbers, there was 1 shooting death for every 1359 officers in the United States in 2013.

122.   According to the FBI, Wichita had 642 officers in 2012 and a population of 386,409

---

[4] http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/expanded-homicide-data-table-14
[5] http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/expanded-homicide-data-table-78 full time law enforcement employees by state and city.

people.[6]

123.    In just 10 months, between October 2011 and July 2012, Wichita Police Department officers shot and killed 5 people and wounded 9 others.

124.    Wichita has 1 police officer for every 601 people.

125.    Wichita's officer to shooting death ratio is 1 death for every 120 officers, which is eleven times greater than the national average.

126.    Wichita had 28 murders in 2012 according to the Wichita Police Department.

127.    Of the 33 homicides in Wichita in 2012, 15% of the people killed were killed by WPD Officers.

128.    In comparison to Wichita, Detroit, Michigan has 2,760 police officers and a population of 713,239 people.[7]

129.    Detroit has 1 police officer for every 258.41 people.

130.    Detroit had 411 total homicides in 2012, 377 in 2011, and 327 in 2010, which is approximately 14 times greater than the average yearly murder rate in Wichita.

131.    Despite having nearly twice the population of Wichita, and more than three times the number of police officers, Detroit only had 3 officer-involved shooting deaths in 2012.

132.    Detroit has 1 shooting death to every 920 police officers, which is 9 times less than the ratio for Wichita.

133.    Chicago has a population of 2,703,713 in 2011 and 12,092 officers for an officer to citizen ratio of 223.59 to 1.[8]

---

6 http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/table-78-state-cuts-2013/table_78_full-time_law_enforcement_employees_kansas_by_city_2011.xls
7 http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-78-state-cuts-2011/table_78_full-time_law_enforcement_employees_michigan_by_city_2011.xls
8 http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/table-78-state-cuts-2011/Table_78_Full-time_Law_Enforcement_Employees_Illinois_by_City_2011.xls

134.   Chicago had 8 officer shooting deaths in 2012.[9]

135.   The ratio of shooting deaths to police officers in Chicago is one death for every 1511 police officers.

136.   Even though Chicago has approximately eight times as many people as Wichita, the ratio of shooting deaths to police officers in Wichita (1/120) is nearly twelve times greater than the ratio in Chicago (1/1511).

137.   Defendant City of Wichita should have realized that the statistics showed there was a pattern and practice of unnecessarily using deadly force by its police department officers.


*Shooting of Stacy Richard*

138.   On February 25, 2014, Stacy Richard, suffered a severe mental health crisis caused by severe clinical depression and alcohol.

139.   Stacy told his wife, Michlle, he was going to commit suicide by shooting himself.

140.   Michlle called Stacy's therapist, Ana Ahrens, and told her that Stacy was suicidal and had a gun.

141.   Ana Ahrens immediately called 911, at approximately 11:42 a.m.

142.    Mrs. Ahrens called 911 expecting the police to help Stacy.

143.   Mrs. Ahrens stayed on the phone with Michlle, and Mrs. Ahrens assistant stayed on the phone with 911 relaying information between them.

144.   911 was told that Stacy was suicidal and in his home with his wife but that no other people were inside the home besides Stacy and Michlle and that neither of them were injured.

145.   Mrs. Ahrens informed WPD that Stacy was not a threat to others but only himself.

___

9 http://www.iprachicago.org/officer%20involved%20shootings_2012.pdf.

146.  Mrs. Ahrens relayed the request from 911 to Michlle requesting that she move to the doorway so she could leave the premises as needed, which Michlle did.

147.  911 dispatched Wichita Police Department officers and Sedgwick County EMS for a suicidal person with a shotgun to his head locked in his bedroom.

148.  At 11:46:20 a.m., Dispatch told officers that no one else was in the home, the kids were in school and no other weapons were being used.

149.  At 11:49:53 a.m., Dispatch reports that husband is "Signal 4" has a history of depression, has not been taking his meds and was drinking alcohol yesterday.

150.  At 11:53:18 a.m., Dispatch relays that a Dr. Challen reported that Stacy said that if WPD shows up he will shoot himself.

151.  At 11:53:27 a.m., dispatch states "Per 3320 [Defendant O'Brien] Standoff**** for Signal 4 shots fired."

152.  At 11:53:57 a.m., Defendant Sgt. O'Brien says on the radio to "get the wife out of there."

153.  Michlle Richard is removed from the doorway and taken to a car.

154.  At 11:54:21 a.m., Defendant O'Brien radios for EMS to Block Graber/Meridian and standoff there.

155.  Dispatch reports Defendant Sgt. O'Brien on scene at 11:56:46 a.m.

156.  Defendant O'Brien states during his interview after the shooting that when he arrived officers were "staging" the house.

157.  Dispatch reports Defendant Mackey assisting at 11:57:14 a.m.

158.  When he arrived and prior to entering the residence, Defendant O'Brien said he did not hear any shots fired, and asked if anyone else had heard shots fired. "Defendant O'Brien reports no one else heard shots fired either.

159.    Defendant O'Brien questioned Plaintiff Michlle Richard, who was crying and upset.

160.    Defendant O'Brien asked if anyone else was in the house besides Stacy Richard. She told him no one else was in the house.

161.    At 11:56:23, Defendant Sgt. O'Brien, the supervisor on scene, states "Nobody else in residence."

162.    Defendant O'Brien asks if there is home phone. Michlle tells him "no."

163.    Defendant O'Brien asks if Stacy has a cell phone. Michlle tells him "yes."

164.    Defendant O'Brien asks Michlle if there are any kids home. She tell him "no, they are at school."

165.    Defendant O'Brien asks Michlle if there are any dogs. She tells him there are two labs.

166.    Defendant Bruce Mackey did not ask Michlle if anyone else was in the premises.

167.    Defendant Bruce Mackey failed to ask Mrs. Richard to provide a diagram of the house, and he failed to obtain one prior to leading a "quick response" breach team into the premises.

168.    Michlle Richard told Defendant O'Brien, the supervising officer on scene, that her husband was suffering from severe depression.

169.    Michlle Richard told Defendant O'Brien, the supervising officer on scene, that her husband was not injured when she left the premises.

170.    The officers locked her in the back of a police vehicle.

171.    Despite Michlle Richard being on the phone with Stacy's therapist, none of the defendants ever spoke with Mrs. Ahrens to utilize her knowledge of Stacy or to get a better understanding of the situation.

172.    Defendant Mackey states he tells Defendant Arterburn to grab a "bunker" and run "1039" [run hot] to the location. Defendant Mackey stated he was not sure if overstepped his bound

when he did that since Defendant O'Brien was the supervisor on scene.

173.    Defendant Bruce Mackey instructed Defendant Arterburn to bring bunkers to the scene with the intent of breaching the residence rather than waiting for SWAT or a negotiator as police and standard police practices dictate.

174.    Upon arrival Defendant Mackey immediately begins to assemble a "quick response" team for entry into the residence "if we make the decision to go."

175.    Defendant Mackey began verbalizing who he wanted and where he wanted them.

176.    Mackey states he told Defendant O'Brien that he wanted to "move the team up, have Johnson open the door, Arterburn to plug the hole with the bunker, hold that point and give verbal commands to the person inside."

177.    Defendant Mackey said he let every officer know "what we are going to do."

178.    Defendant Mackey said it is difficult for him in a situation like this, "even though he has trust in the officers."

179.    Defendant Mackey stated "I know what I need to do and what needs to happen."

180.    Defendant Mackey did not ask O'Brien to be in the "stack" [entry team] because he was a supervisor and that it would be better for O'Brien to remain outside, "otherwise he is just an officer."

181.    Mackey stated he was "in SWAT mode" and indicated he was nervous because the other officers were not trained in SWAT tactics and hope that they could "fill that void."

182.    Mackey stated in his interview "We had exposed the primary threat" showing he, and the other Defendants, saw Stacy as a threat rather than a person to help.

183.    Mackey stated during his interview that he felt responsible for the officers and that they were looking to him to make the appropriate decisions.

184.   Mackey states in his interview after the shooting that he was "scared" and "frantically" trying to key up on the new radio system to make sure everyone outside knew where they were.

185.   Mackey further stated that Arterburn had never trained with them before and he was having to hold on to him to keep him from running into the room.

186.   Mackey felt that because of Officer Stevens's position in the long hallway from the kitchen to the den, that Officer Stevens had "nowhere to go. It was just bad decisions because of the environment."

187.   Mackey stated he could tell Defendant Stevens was "pissed" and told him to breathe.

188.   Mackey said that when they stopped firing for a tactical reload, that Arterburn accidentally discharged his weapon.

189.   The accidental discharge can be heard on the video of the shooting.

190.   At 11:57:59, Defendant Sgt. O'Brien states "Give us 1033. [emergency radio access] We are going to knock and make entry…We are not going to move in."

191.   Defendant O'Brien states in his interview with WPD that they are going to "take it slow" and are only going to "plug the hole" by opening the front door and announcing. They are not going to go in.

192.   Defendant O'Brien states he tried to call the cell phone of Stacy Richard twice at 11:56 a.m. but no one answered.

193.   Defendant O'Brien knew Michlle was still on the phone with Ana Ahrens the therapist.

194.   Defendant O'Brien is standing at the Northwest corner of the house with a five man entry team when he makes the calls to Stacy's phone. Defendant O'Brien is the sixth man of the entry team.

195.    The members of the entry team are Defendants Brian Arterburn with a bunker, Bruce Mackey, William Stevens, Matthew Phillips, Edward Johnson, and then O'Brien, in that order.

196.    Defendant O'Brien states he told the team "We're not going to make entry into that house. All we're going to do is plug the hole and make an announcement from the door and get a view of the layout inside."

197.    The "hole" according to Defendant O'Brien was the front door.

198.    Defendant O'Brien says he told the team "We're not going to rush to failure. We'll take it slow. Methodically move into the house."

199.    Defendant O'Brien abdicated his role as supervisor by turning control over the situation to a subordinate, Defendant Bruce Mackey, and by not forcing them to wait a negotiator.

200.    When asked if the team is looking to him as the supervisor, Defendant O'Brien states "yes and no."

201.    Defendant Bruce Mackey, who was, or had been on SWAT, was "giving good direction" according to Defendant O'Brien.

202.    The team moved to the front door and Officer Johnson opened the door so that Defendant Arterburn could place the bunker and himself in the doorway, with Defendant Mackey behind him.

203.    Despite Defendant O'Brien's instructions not to make entry into the house, Defendant Mackey orders the team to enter the home and "cover left and right" to enter the residence

204.    Defendant O'Brien did not tell the officers to stop and hold at the door as was originally planned and stated.

205.    Defendants Mackey and Arterburn went "left" through the living room toward the hallway

to the bedrooms.

206.    Defendants Phillips and Stevens went right though the living room to the kitchen.

207.    Defendant O'Brien and Officer Johnson were moving left behind Mackey.

208.    The officers that went right, Defendants Stevens and Phillips, called out that they have "one on the couch."

209.    Defendant Mackey then guides Defendant Arterburn with the bunker into the hallway between the Kitchen and the den where Stacy Richard was located laying on a couch.

210.    Defendant O'Brien further failed to supervise the team by not recalling the team outside once they made contact with Stacy Richard.

211.    At 11:59:37 a.m., Defendant Mackey says to "maintain the air, one on couch with gun to his face."

212.    At 11:59:57 a.m., Defendant Mackey states "to officers outside…Southeast part of residence he is on the couch."

213.    Defendant O'Brien further fails to supervise the incident by taking Officer Johnson and attempting to clear the bedrooms.

214.    One of the Defendants attempts to speak with Stacy who is allegedly lying on the couch with a gun in his hand.

215.    Stacy allegedly points the gun at the Defendant officers who open fire.

216.    The Defendant officers, Mackey, Arterburn, Stevens, and Phillips can be seen in the video shooting over 40 rounds at Stacy.

217.    Stacy can be seen rolling back and forth as the bullets striking him.

218.    Stacy can be heard screaming in pain and fear as he is being shot.

219.    Stacy never fired a weapon during the encounter with the police.

220. Defendant Officers Mackey, Arterburn, Stevens and Phillips shot Stacy in the head, chest, left thoracoabdomen, anterior abdomen, penis, scrotum, right buttock, and numerous times in the upper and lower parts of both legs.

221. The officers' bullets riddled Stacy's body, the house, and even hit the house of the neighbor across the back yard.

222. At 12:00:27 a.m., EMS and fire are told to move in after the Defendant officers shoot Stacy.

223. Defendant Mackey during his interview states that it was "at most ten minutes" from the time they enter the hallway until they started firing.

224. The radio detail shows the Defendant officers were on scene no more than 5 minutes before entering the home and firing upon Stacy.

225. All of the Defendants, including the supervising officer, Defendant Sgt. O'Brien knew that this was a Critical Incident Team ("CIT") situation.

226. None of the officers who breached the residence were trained at the time as a Crisis Intervention Team (CIT) Officer.

227. Even though they knew Stacy suffered from mental illness, none of the officers requested a CIT Officer to be dispatched to their location to assist with the mental health crisis.

228. None of the officers, other than Defendant Mackey, were trained in SWAT tactics, and were not SWAT team members.

229. Prior to entering the premises, all of the officers had time to consider the situation and try to de-escalate the situation by not rushing into a confrontation.

230. None of the Defendants provided, or attempted to provide, first aide to Stacy. Instead they handcuffed Stacy.

231. If either Officer had followed WPD policy and requested a CIT officer, or waited until a

negotiator arrived, the situation could have been de-escalated and Stacy would be alive today.

232.   It is undisputed that the Defendant Officers fired upon Stacy Richard in the course of their employment as Wichita Police Department Officers.

233.   Defendant City is the employer of the Defendant Officers and is responsible for training them in dealing with Signal 4 situations.

234.   Situations where a person is suicidal and inside their home are common occurrence for which Defendant City should have properly trained its officers.

235.   Defendant City is also responsible for training Defendants Officers in dealing with mentally ill citizens and the recognition of situations that call for CIT member or negotiator intervention.

236.   Stacy Richard experienced the conscious pain and suffering associated with being shot 16 times with 9mm hollow point bullets designed to do the greatest amount of damage when striking a person's body.

237.   Stacy can be heard in video screaming and crying out in pain and agony.

238.   Stacy was taken to Via Christi St. Francis medical center for treatment of his wounds.

239.   Defendant City of Wichita, through its senior leadership at WPD, refused to allow access to Stacy Richard while he was in their custody at the hospital because WPD wanted a chance to question him without counsel being present when he woke up. Even after Sedgwick County District Court Judge Eric Yost ordered them to do so, they refused to allow access. City Attorney Sharon Dickgrafe had to go to the hospital and override the WPD senior leadership and order the officers to allow legal counsel and his wife to see Stacy per the Judge's order.

240.   As a result of the injuries, Stacy was forced to endure numerous surgeries to repair his shredded body and legs.

241.   The physical recovery took months and Stacy incurred more than $400,000.00 in medical bills for his hospital stay, surgeries, devises, medication, and other costs associated with his medical care.

242.   After realizing he was not going to die from his injuries, Stacy's outlook on life greatly improved for a few months. He wanted to get healthy and get back to work. He did not like not being able to provide for his family.

243.   However, even after he was released, Stacy needed full time care for months afterward because he was unable to ambulate due to the extensive damage to his legs.

244.   Stacy suffered through the extreme pain as a result of the 16 gunshot wounds and the physical therapy that came with trying to get better.

245.   More than six months after being shot, Stacy was able to return to work on a limited basis.

246.   However, Stacy realized that could not escape the constant pain caused by his injuries. He always hurt and the pain would likely never end.

247.   He also lived in fear. Defendant City of Wichita threatened to charge him with Felony assault on a law enforcement officer.  If that happened, he would lose his job, his home, and his family.

248.   In addition, as a result of being shot in the penis and scrotum, Stacy Richard was rendered impotent and unable to achieve an erection, and even erectile dysfunction drugs such as Viagra and Cialis were ineffective.

249.   Due to his impotence, Stacy Richard could no longer have sexual relations with his wife, who was 15 years younger than he.

250.   The injury to Stacy's penis and scrotum had a profound impact on his mental health, marriage, and self-image.

251.   Stacy became withdrawn and sullen as he sank into a deeper and deeper depression.

252.   In October 2014, Stacy Richard committed suicide by hanging himself in his garage.

253.   Ms. Richard lost her husband, lover, friend, soul mate and companion.

254.   Michlle Richard heard the barrage of bullets as they repeatedly shot her husband.

255.   Michlle Richard suffered emotional damages from hearing the shooting of her husband as well as the pain and suffering caused by the loss of consortium and intimacy with her husband. She also suffered with him as he tried to overcome the pain of his injuries, both mental and physical.

256.   Michlle watched helplessly as he slipped away into the dark confines of his depression, which was so much deeper and darker than any bouts of depression he experience before.

257.   From the time he was shot, Michlle Richard also suffered the loss of her husband's advice, counsel, and provision of household services. He never was the same after he was shot.

258.   Under the pretext of investigating the shooting, Defendants subjected Michlle to an unlawful detention and interrogation that lasted for numerous hours and caused her mental pain, fear, nervousness, uncertainty, humiliation, and indignity.

259.   Michlle experience weight gain, insomnia, depression, hair loss, hives and panic attacks.

260.   Defendants immediately and arbitrarily treated the shooting of Stacy Richard as justifiable and constructed their investigation to support their predetermined conclusion.

261.   Defendant City of Wichita failed to properly investigate the shooting.

262.   Decedent's claims for damages survive him pursuant to Kansas law.

## Count 1 – 4th Amendment – Excessive Use of Force

263.   Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

264.   Defendant Officers acted "under color of law."

265.   Rather than slowing the situation down and following what Defendant City's own training and policies state, and rather than stopping at the door as Defendant Sgt. O'Brien instructed, Defendant Officers breached the house within minutes of arrival.   The Defendant officers own reckless or deliberate conduct during the seizure of Stacy Richard unreasonably created and is immediately connected to the alleged need to use lethal force.

266.   The Defendant Officers' actions creating the need for lethal force amounts to deliberate indifference to the 4th amendment constitutional rights of Stacy Richard.

267.   The Defendant Officers escalated the situation, and created any alleged need for deadly force.

268.   Based on these facts, the Defendant Officers acted with deliberate indifference to Stacy Richard's 4th and 14th Amendment Constitutional rights, and such actions must be analyzed under the 4th Amendment's prohibition against unreasonable search and seizures.

269.   As a direct and proximate result of the excessive force, Plaintiff suffered damages.

## Count 2 – Failure to Train

270.   Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

271.   Defendant City knew, or should have known, its officers would encounter situations wherein its officers would receive calls regarding citizens suffering from mental illness especially with the "disturbing trend" of increased incidents between the Wichita Police

Department Officers and the mentally ill.

272. Defendant City knew, or should have known, that its officers would encounter situations where a person was armed and alone in a home threatening to commit suicide.

273. In the years prior to this shooting, numerous incidents occurred that showed a need to better train WPD officers in dealing with the mentally ill.

274. The enormous number of police shootings in relation to the population size of the Defendant City, in comparison to the national average, and the averages for other much larger cities in the United States, shows a lack of training, a lack of supervision, and a widespread and unwritten *de facto* policy of shoot first and ask questions later by this City's police department which is inappropriate and unlawful.

275. The Wichita Police Department's use of the "Threat Assessment" at the time Defendants shot Stacy Richard, which mandated that officers imagine the worst case scenario and use the next level of force above what they imagined, created a bright line rule that prevented officers from using proper discretion to determine the appropriate level of force based on the circumstances.

276. The decision by Defendant Officers, including the supervisor on scene Defendant O'Brien, shows a complete lack of training dealing with suicidal citizens, and a complete lack of supervision.

277. The failure of Defendant Officers to request a CIT Officer and negotiator is a direct result of the City of Wichita's failure to train its officers in dealing with the mentally ill and a failure to properly supervise the officers on the scene.

278. The failure of the Defendant Officers to establish a perimeter and request SWAT and a negotiator to de-escalate the situation is a direct result of the failure of the City of Wichita's

police department to adequately train its officers for dealing with this common occurrence.

279.   Despite the obvious need for a policy or regulation arising out of these "disturbing trends," the Defendant City failed to enact policies or regulations to address the "disturbing trend."

280.   Defendant City knew, or should have known, that such a failure to enact such policies for training and guidance would result in the deprivation of constitutional rights of citizens by members of the Wichita Police Department who use deadly force.

281.   The failure of the City to properly provide adequate training and guidance on the use of deadly force and on police interactions with the mentally ill resulted in the deprivation of Stacy Richard's 4th and 14th Amendment rights.

282.   Plaintiff suffered damages as a result.


## Count 3 – Wrongful Death - Negligence

283.   Plaintiff incorporate by reference all other allegations set forth in the paragraphs above.

284.   Defendant officers owed a duty to Stacy Richard not to harm him and to only use reasonable force if necessary.

285.   Defendant officers breached that duty to Stacy Richard by negligently failing to follow standard police practices and procedure by entering the residence unnecessarily and creating the scenario in which they felt the need to use lethal force against Stacy Richard.

286.   Stacy Richard suffered severe, life threatening and life altering injuries at the hands of the officers that caused him unbearable physical and mental pain which eventually led to his suicide.

287.   Defendant officer's negligent use of deadly force solely, directly, and proximately caused Stacy to be in a state of mind that led to his suicide and the wrongful death of Stacy Richard.

288. The Defendant Officers do not have discretion to unnecessarily create a situation in which lethal force is needed.

289. Pursuant to the Kansas Tort Claims Act ("KTCA"), Defendant City is liable as a matter of law for the actions of Defendants if they unreasonably, wantonly, or maliciously injured Stacy Richard in the scope of their employment.

290. No exception under the KTCA applies.

291. As a direct and proximate result of the wrongful shooting of Stacy Richard that led to his eventual suicide, Plaintiff suffered and will continue to suffer damages, including but not limited to (a) mental anguish, suffering, and bereavement, (b) loss of society, comfort, and companionship, (c) medical expenses and other expenses for the medical treatment of Stacy Richard, (d) loss of Stacy's services, attention, filial care, advice, and protection, (e) loss of earnings and financial support that Stacy would have contributed to Plaintiff during the remainder of his lifetime, and (f) funeral expenses.

292. The claims for Stacy's injuries and wrongful death survive his death pursuant to K.S.A. 60-1801.

293. As a direct and proximate result of the wrongful death of Stacy Richard, his estate suffered damages.

## Count 4 – Negligence

294. Plaintiff incorporate by reference all other allegations set forth in the paragraphs above.

295. Defendants owed a duty to Stacy not to use excessive or unreasonable force against him.

296. While in the course of their employment as a Wichita Police Department Officers, Defendant Officers breached the duty to decedent and used excessive or unreasonable force

against him by creating the alleged need for the use of force by failing to follow the policies, guidelines, and accepted police practices and procedures regarding a suicidal person.

297.    Defendant Officers do not have discretion to create the need for lethal force.

298.    Any use of lethal force against Stacy used as a result of the Defendant Officer's failure to follow commonly accepted police practices and procedures is unreasonable or excessive.

299.    Pursuant to the KTCA, Defendant City is liable as a matter of law for the actions of Defendant Officers if they negligently or wrongfully injured Stacy in the scope of their employment.

300.    No exception under the KTCA applies.

301.    The claims for Stacy's injuries and wrongful death survive his death pursuant to K.S.A. 60-1801.

302.    As a result of their breach of duty during the course of their employment, Defendants caused Plaintiff to suffer damages.

## Count 5 – Negligent Infliction of Emotional Distress

303.    Plaintiff incorporate by reference all other allegations set forth in the paragraphs above.

304.    The defendant officers' actions injured Plaintiff, Stacy and Stacy's wife by causing them emotional distress associated with the unlawful use of force against Stacy Richard.

305.    Defendant City is liable as a matter of law for the actions of Defendant Officers if they negligently or wrongfully injured Plaintiff in the scope of their employment, pursuant to the Kansas Tort Claims Act ("KTCA") K.S.A. 75-6103.

306.    The claims for Stacy's injuries for Negligent Infliction of Emotional Distress survive his death pursuant to K.S.A. 60-1801.

307.   As a direct and proximate result of the actions of all the defendants, Plaintiff and the decedent's estate suffered injuries.

## COUNT 6 – Pattern or Practice of Excessive Force

308.   Plaintiff incorporate by reference all other allegations set forth in the paragraphs above.

309.   Defendant City, through its leadership in the Wichita Police Department and other departments in the City of Wichita, conducted a pattern and practice of concealing misconduct on the part its rank and file officers all the way to its most senior leadership, including, but not limited to officer involved shootings. Defendant City of Wichita should have known that such actions would undermine accountability and expose the Wichita community to greater risk of excessive force when officers know they will not be punished for the use of excessive force, especially deadly force resulting if death or serious harm.

310.   Defendant City of Wichita's failure to properly, objectively and timely investigate officer involved shootings, and other allegations of excessive force contribute to a pattern and practice of excessive force by Defendant City of Wichita and its police department.

311.   Defendant City of Wichita failed to properly supervise not only the officers accused of using excessive force, but also failed to supervise the investigation into the use of force against those officers. This pattern and practice of failing to adequately investigate officer involved shootings undermines credibility and accountability and leaves officers with the impression that misconduct will be tolerated and concealed by Defendant City of Wichita in the interests of protecting and insulating itself from lawsuits related to the use of force.

312.   The policy regarding the use of force that was in effect at the time Defendants shot Stacy required officers to escalate the use of force without regard to the circumstances presented,

based on imagined possible threats of force, even if those threats of force were not likely

313.    Defendant City should have known that this policy would create situations wherein officers unnecessarily escalated the use of force.

314.    The excessive use of force based on the "threat assessment" policy or "plus one policy" was widespread, persistent, and had become deeply imbedded in the Wichita Police Department.

315.    The City of Wichita, knew, or should have known that such a pattern and practice would be interpreted, applied and enforced in such a manner as to likely to result in the violation of a citizen's 4th Amendment and 14th Amendment rights.

316.    The City of Wichita knew, or should have known, that the use of force policy as applied, combined with the pattern and practice of overlooking and not properly investigating the use of deadly force, created a situation in which the civil rights of citizens were being violated as evidenced by the "disturbing trend" of the outrageously high number of police shootings by Wichita Police Department officers, and which ultimately resulted in the violation of Stacy Richard's 4th Amendment, and 14th Amendment rights.

317.    Defendant City's enforcement and application of the threat assessment policy combined with the pattern and practice of concealment and failure to investigate the use of deadly force resulted in the violation of Plaintiff's 4th and 14th Amendment rights and being shot 16 times.

318.    As a result of that violation, Plaintiff suffered damages.


## COUNT 7 - BATTERY

319.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

320.   Defendant officers did unlawfully, wrongfully and intentionally create a situation in which lethal force allegedly needed to be used against Stacy Richard without privilege to do so.

321.   Pursuant to the KTCA, Defendant City is liable as a matter of law for the actions of Defendant Officers if they wrongfully injured Stacy Richard in the scope of their employment.

322.   No exception under the KTCA applies.

323.   Defendants' actions resulted in physical harm to Stacy Richard.

324.   This claim for Battery survives Stacy's death pursuant to K.S.A. 60-1801.

325.   Defendants' actions caused Plaintiff to suffer damages.

## COUNT 8 – Cost of Medical Care

326.   Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

327.   Defendant Officers injured Stacy Richard when they shot him 16 times while taking him into custody in the course of their employment as police officers for Defendant City of Wichita.

328.   Pursuant to K.S.A. 19-1910 and/or K.S.A. 22-4612, as a result of Stacy Richard's injuries, Defendant City of Wichita is responsible for the costs of any medical care not paid for by Stacy Richard's insurance.

WHEREFORE, Plaintiff prays for damages in excess of $5,000,000.00 for all counts, exclusive of interest, costs and attorney fees; Plaintiff requests punitive damages against the individual officers; that Plaintiff be granted attorney fees and costs pursuant to 42 U.S.C. §1988 for each of the applicable claims; that Plaintiff be granted pre and post judgment interest on any damages awarded at the statutory rate, and for other and such further relief as the Court deems just

and equitable.

## JURY TRIAL DEMAND

Plaintiff respectfully requests that this matter be tried to a jury on all of the claims against the Defendants.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff respectfully requests that trial be held in Wichita, Kansas.

Respectfully submitted this 16th day of September, 2015,

/s/James A. Thompson
James A. Thompson, KS SC # 21263
Malone Dwire & Thompson, LLC
P.O. Box 2082
Wichita, KS 67201
(316) 265-4248
(316) 265-2432
jthompson@mdtlawyer.com

And

Don Snook, KS SC #21775
Snook Law Offices, LLC
5020 E. Central Ave Suite A
Wichita, Kansas 67208
T: 316-512-5608
E: Don@Snooklawllc.com

*Attorneys for Plaintiff*